# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 29, 2010

## STATE OF TENNESSEE v. EDDIE LATTIMORE

**Appeal from the Circuit Court for Dekalb County**
**No.  07-045     Leon C. Burns, Jr., Judge**

**No. M2008-02124-CCA-R3-CD - Filed November 18, 2010**

The Defendant, Eddie Lattimore, was found guilty by a Dekalb County Circuit Court jury of possession of schedule II hydromorphone with the intent to sell, a Class C felony; possession of schedule II morphine, a Class A misdemeanor; and possession of drug paraphernalia, a Class A misdemeanor.  See T.C.A. §§ 39-17-417(a)(4), -418(a), -425(a)(1) (2010).  He was sentenced as a Range III, persistent offender to fourteen years' confinement for possession of hydromorphone with intent to sell and to eleven months, twenty-nine days' each for possession of morphine and possession of drug paraphernalia, all to be served concurrently. On appeal, he contends that the evidence was insufficient to support his convictions.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Kevin S. Latta, Pulaski, Tennessee, for the appellant, Eddie Lattimore.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall A. York, District Attorney General; and Josh Parsons, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to a four-month investigation of the Defendant, leading to the search of his home and the discovery of schedule II controlled substances and drug paraphernalia. Dekalb County Sheriff's Detective Jon Odom testified that he had worked in law enforcement for twelve years and that he had a great deal of experience investigating drug offenses.  He said he began investigating the Defendant after he received telephone calls

regarding activities at the Defendant's mobile home. He conducted surveillance of the Defendant's home and saw "several cars coming in all throughout the day and night, staying just a couple of minutes, getting back in the car and leaving." He said he recognized some of the visitors as persons he had arrested in the past for drug offenses. Based on these observations, he had no doubt drug activity was occurring at the Defendant's home. He said he and Dekalb County Sheriff Patrick Ray watched the Defendant's home for four months before obtaining a search warrant. He said that during the surveillance, he did not see anyone living at the home other than the Defendant. He did not believe that the Defendant had a job because he did not see him leave the home at times that would correspond to a morning or evening work shift.

Detective Odom testified that the Defendant and Tonya Silcox were present when he searched the Defendant's home. He said he found dilaudid pills and drug paraphernalia on Ms. Silcox. He said the Defendant owned the home and the land it was on. He said that three vehicles were outside the home, two of which belonged to the Defendant and one to Ms. Silcox. He said he did not find female clothing at the home, mail addressed to anyone other than the Defendant, pay stubs or prescriptions belonging to anyone other than the Defendant, or any other evidence indicating that anyone other than the Defendant lived there.

Detective Odom testified that the Defendant's home had two bedrooms. He said he found five morphine pills, nine and a half dilaudid pills, and a plastic bag containing hypodermic needles underneath the mattress in bedroom one. He said that the pills were placed in the corners of plastic bags and tied at the top and that this was a common packaging method among drug dealers. He said dilaudid pills were the "number one problem" in Dekalb County. He said the pills were illegally used by crushing them, mixing the powder with liquid, and then injecting the substance into the body using a hypodermic needle. He said that the Defendant did not have a prescription for the morphine or dilaudid pills and that no prescription bottles or prescription documents for the pills were found in the Defendant's home. In bedroom two, he found a pen used to identify counterfeit money and a police scanner. He said he found a second police scanner in the living room that was turned on. He said police scanners were commonly used by drug dealers to monitor police movement.

Detective Odom testified that he found $6,250 wrapped in plastic in the Defendant's freezer and a large amount of cash in an inner pocket of a jacket hanging in the kitchen pantry. He said that he found a bank book in the jacket and that the Defendant had an active checking account with Dekalb Community Bank. He said he also found cash on the Defendant. He said that he found a large quantity of plastic sandwich bags in assorted sizes and shapes in the kitchen and that these bags were commonly associated with the sale of drugs. He said he found a loaded and cocked handgun, as well as extra bullets, in a shed behind the Defendant's home.

On cross-examination, Detective Odom testified that visitors to the Defendant's home would "stand at the front door, sometimes they go in, sometimes [the Defendant came] out to the car and meets them. Then they leave." He said that the Defendant rarely came outside to meet his visitors and that he was unable to see any drug transactions while watching the Defendant's home. He could not identify which room was the master bedroom and did not recall the Defendant telling him that bedroom number two was the Defendant's bedroom. Detective Odom said bedroom two was the larger bedroom in the home. He said that he found the Defendant's bank statements in bedroom two and that he did not find any illegal drugs in that room. He said that pens used to identify counterfeit money and police scanners were legal to own but that police scanners were commonly used by drug dealers and were found in the vast majority of homes searched for suspected drug dealing. He said that although bedroom one did not contain any of the Defendant's personal items, it also did not contain anything that would indicate that a female lived there, such as women's clothing, toiletries, or other personal effects. He said he searched Ms. Silcox and her purse and found seven dilaudid pills, hypodermic needles, syringes, a tourniquet, and a tissue with fresh blood on it. He said that her purse was found in the kitchen and that the fresh blood on the tissue indicated that she had "just shot up right there in the house." He said he also found a syringe in the Defendant's driveway but did not find drugs or paraphernalia on the Defendant.

Dekalb County Sheriff Patrick Ray testified that he supervised the investigation of the Defendant and participated in the surveillance and search of his home. He said he did not see Ms. Silcox at the Defendant's home during the four months of surveillance. He said he found no women's clothing in the home other than what Ms. Silcox wore. He said he did not find mail, prescriptions, or other items addressed to persons other than the Defendant. He said his surveillance efforts and the search of the home indicated that the Defendant lived alone.

Sheriff Ray testified that it was common to find drugs outside of the bedroom during searches of suspected drug dealers' homes and that drug dealers often hid drugs or money away from their personal spaces. He also said it was common for drug dealers to store large amounts of cash in their homes instead of keeping it in banks because this avoided raising suspicions of illegal sources of income.

On cross-examination, Sheriff Ray agreed he knew before searching the Defendant's home that the Defendant would be arrested. He said that Ms. Silcox was in the kitchen when he entered the home and that he did not see her enter the bedrooms.

Carl Smith testified that he worked for the Tennessee Bureau of Investigation as a forensic scientist. He said he analyzed the pills found at the Defendant's home and

determined that they were hydromorphone, also known as dilaudid, and morphine. He said both drugs were schedule II controlled substances.

The Defendant did not testify. Upon the foregoing proof, the jury found the Defendant guilty of possession of schedule II hydromorphone with the intent to sell, possession of schedule II morphine, and possession of drug paraphernalia. The State and the Defendant then presented evidence regarding a fourth charge against the Defendant, possession of a handgun by a convicted felon, and the jury found the Defendant not guilty. The Defendant was sentenced as a Range III, persistent offender to fourteen years' confinement for possession of hydromorphone with intent to sell and to eleven months, twenty-nine days' each for possession of morphine and possession of drug paraphernalia, all to be served concurrently. This appeal followed.

The Defendant contends that the evidence was insufficient to support his convictions because it did not establish that he knowingly possessed hydromorphone with intent to sell it or that he knowingly possessed morphine or drug paraphernalia. The State contends that the evidence was sufficient to support the Defendant's convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As pertinent to this appeal,

> (a) It is an offense for a defendant to knowingly:
> . . .
> (4) Possess a controlled substance with intent to manufacture, deliver or sell the controlled substance.

T.C.A. § 39-17-417(a)(4). With regard to simple possession:

> (a) It is an offense for a person to knowingly possess . . . a controlled substance, unless the substance was obtained directly

from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice. Id. § 39-17-418(a). With regard to possession of drug paraphernalia:

(a)(1) . . .it is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this part.

Id. § 39-17-425(a)(1).

A person acts knowingly who is aware of the nature of his or her conduct. Id. § 39-11-106(a)(20) (2010). A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct. Id. § 39-11-106(a)(18). Intent may be inferred from the surrounding facts and circumstances. See State v. Lowery, 667 S.W.2d 52, 57 (Tenn. 1984); Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). Possession with intent to sell may be inferred from "the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest." T.C.A. § 39-17-419 (2010).

Possession may be either actual or constructive. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). Constructive possession occurs when a person knowingly has "'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting United States v. Craig, 522 F.2d 29, 32 (6th Cir. 1975)). "Although a defendant's mere presence at a place where controlled substances are found will not support an inference of possession, a person in possession of the premises where controlled substances are found may also be presumed to possess the controlled substances themselves." State v. Ross, 49 S.W.3d 833, 846 (Tenn. 2001) (citing Armstrong v. State, 548 S.W.2d 334 (Tenn. Crim. App. 1976)).

Taken in the light most favorable to the State, the evidence established that persons who had been arrested for drug offenses came to the Defendant's home, briefly entered the home or waited at the door, and then left. This occurred repeatedly over a four-month period. The Defendant owned the home and lived there alone. Five morphine pills, nine and a half hydromorphone pills, and a plastic bag containing hypodermic needles were found underneath the mattress in bedroom one. The pills were packaged in the corners of sandwich bags, a method common among drug dealers. The Defendant did not have a prescription for the pills. Although bedroom one did not contain any of the Defendant's personal items,

Sheriff Ray testified that it was common for drug dealers to hide drugs or money away from their personal spaces. A pen used to identify counterfeit money and a police scanner were found in bedroom two. A second police scanner was found turned on in the living room. Detective Odom said police scanners were commonly used by drug dealers to monitor police movement. Thousands of dollars were found in the Defendant's freezer and in a jacket hanging in the kitchen pantry, despite the Defendant having an active checking account. No evidence indicated that the Defendant was employed or otherwise obtained this money legally. Sheriff Ray said it was common for drug dealers to store large amounts of cash in their homes instead of keeping it in banks because this avoided raising suspicions of illegal sources of income. Detective Odom testified that money was found on the Defendant and that a woman was found in the Defendant's home who possessed and recently had used hydromorphone. Ms. Silcox was not seen at the Defendant's home during four months of surveillance, and no female clothing or toiletries were found indicating that she lived there. Ms. Silcox and her purse were found in the Defendant's kitchen. No testimony indicated that she entered the bedrooms. A large quantity of plastic sandwich bags was found in the kitchen, which Detective Odom said was commonly associated with the sale of drugs. From this evidence, the jury could properly infer the Defendant's knowing possession of schedule II controlled substances and drug paraphernalia and his intent to sell those substances.

We conclude that a rational trier of fact could have found the elements of possession of schedule II hydromorphone with the intent to sell, possession of schedule II morphine, and possession of drug paraphernalia beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's convictions.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE